IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal |
| | ) No. 24-130 (BMC) |
| Government, | ) |
| | ) SENTENCING |
| vs. | ) |
| | ) Brooklyn, New York |
| MICHAEL KUILAN, | ) Date: May 27, 2025 |
| | ) Time: 4:00 p.m. |
| Defendant. | ) |

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Government: Adam Amir, AUSA
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
718-254-6116

For the Defendant: Howard Greenberg, Esq.
86 Court Street
Brooklyn, New York 11201
718-797-1800

Also Present: Brian Woo, US Probation Officer

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 4:05 p.m., in open court, to wit:)

THE COURTROOM DEPUTY: Criminal cause for sentencing, 24-CR-00130, *USA v. Michael Kuilan*.

Please state your appearances for the record, starting with the government.

MR. AMIR: Good afternoon, Your Honor.

Adam Amir for the government, joined by intern Ethan Banafsheha, as well as Probation Department Officer Brian Woo.

THE COURT: Okay.

MR. GREENBERG: Judge, I'll work from a seated position, with your permission, because of a medical condition.

THE COURT: Fine.

MR. GREENBERG: Howard Greenberg for the defendant.

Hello, everybody.

THE COURT: Hello.

Hello, Mr. Kuilan.

THE DEFENDANT: How you doing, Judge.

THE COURT: Okay.

Who else is at counsel table?

MR. GREENBERG: Oh. Forgive me.

I'm here with Samantha Imber from our office, Your Honor. Thank you for asking.

THE COURT: Okay. We are on for sentencing on

Counts 3 and 4.

Let me go through with you first the papers that I have reviewed in preparing for sentencing so that we're all on the same page.

First, I have the presentence investigation report. That was filed on February 24 of this year.

Then I have a mitigation report submitted by Mr. Greenberg. That was on February 27.

I then have the government's sentencing memorandum. That was March 4.

And then I have the same day another sentencing memorandum from the government.

I think I've got that right.

I will note there's also an order of forfeiture which I've signed for $30,000 and the gun and ammunition.

Anything else I should be looking at?

MR. AMIR: No, Your Honor. I'll note that our second filing was a duplicate of the defense submission. I wanted to make sure the Court had a copy. It was not reflected on the public docket.

THE COURT: I see. Yeah. I got that.

Okay. Mr. Greenberg, let me confirm with you and Mr. Kuilan that you have gone over together the presentence investigation report.

MR. GREENBERG: Yes.

THE COURT: Is that right, Mr. Kuilan?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Based on the parties' submission, I assume there's no dispute about the description of the offense or the offender characteristics as set forth in the PSR.

Am I right about that?

MR. GREENBERG: You're right about that, Judge.

MR. AMIR: Yes, Judge. No dispute.

THE COURT: I will, therefore, accept those portions of section A and C of the PSR as described, the offense and the offender characteristics, as my findings of fact for purposes of this hearing.

Next, with regard to the sentencing guidelines, which are, of course, merely advisory and only one factor for me to consider in determining the appropriate sentence, I think we're agreed that we're talking about an offense level of 39, a criminal history category of I, and that would give us a sentencing range of 262 to 327 months of custody.

Any dispute about that?

MR. AMIR: Not from the government.

MR. GREENBERG: As a concept, we agree with what you just said.

THE COURT: Okay. That's my finding as to the guidelines.

Let me then hear from the parties as to the application of all of the sentencing factors under 18 USC Section 3553(a).

I will start with you, Mr. Greenberg.

MR. GREENBERG: Thank you, Your Honor.

So among the very first things a mental health professional asks of a new patient is as follows: Do you love your mother. Oftentimes it is the very first thing, the answer to which tells everything, and that's not an understatement, that one needs to know about the person in front of a mental health professional.

The defendant's emotionally absent mother was virtually the same thing as not having a mother. When the person, the mother, who teaches that hard choices beget an easy life, is emotionally and later physically absent, then it falls to the child to make easy choices that make for an easy life until the proverbial shoe drops, which I think aptly sums up a drug dealer.

After 34 years of criminal practice, it is no professional surprise to me that someone raised without a mother, who is emotionally unavailable to the child, would become a drug dealer.

I mean, his mother, not a surprise, would not even participate in the preparation of the defendant's presentence report, mitigation report memorandum. His own mother would

not submit a writing on his behalf. Even Jesse James' mother during Jesse James' tribulation said a few words that might enure to the benefit of her son. Call this strike one.

Then the defendant suffers the loss of his father during his adolescence at the age of 16, when the man died in prison. Call it strike 1-A.

His mother, to be sure, was devoted to her husband, but his mother also, to be sure, was not devoted to their child, the defendant.

Dad was a lifelong alcoholic, to boot.

His mother, not even one time, has appeared in court with us.

I know that this damage is permanent. I might digress and say I grew up without a mother, and notwithstanding all of my professional successes, the damage is permanent. You never get over it. There's never closure when you ask yourself, why? Why did my mother abandon me? There just isn't.

So the defendant has suffered in his life a series of profound adversities, read losses, that beget substance abuse, the ladder or the segue to an amateur, if not professional, life of drug dealing.

Call the abuse of narcotic drugs to self-medicate his inner child strike two.

Then the case styled the *United States of America*

*against Michael Kuilan*, Case 1:24-CR-00130-BMC is strike 3.

The defendant quit school on his own motion in the 10th grade. But then he taught himself to make furniture. He should have stuck with this. Repeated drug arrests followed on, with or without jail bids.

The fact that the deceased in this case, as it happens, was a cause celebre is irrelevant to this case. The life of a transgender person is not worth any more or less; it is not more or less valuable than in any other life. But she had a right to uncorrupted product.

But the defendant in this case was not responsible for her genetic predisposition that made her an addictive personality. No one in this case made her consume this or any other narcotic drug.

The defendant obtained a stash from his supplier. We made an unsuccessful effort to drop a dime on that person. So the defendant is, in part, a middleman. He, in turn, sells to the street level dealer, the former codefendant in this case, and the deceased was one of the street level dealer's customers.

I blame the overarching supplier, the defendant who was the middleman, and the street level seller, and the deceased for her death.

One cannot ignore the dimension of personal responsibility that the deceased has to take in this equation.

A drug-addled individual is not by any measure of common sense a role model.

Once this case was borne, the defendant, knowing he might well be remanded, made the hard choice. He voluntarily self-surrendered, call it step 1, in his rehabilitation.

Since this case was borne, the defendant, has, so to speak, taken the cure, but addiction is hard. As a child, there were times when he didn't have what to eat, but he overcame it. As he grew older, he virtually always worked. So he tried.

He takes on the responsibility of raising an infant child of another as his own. She has only known the drug dealer as a father. I will say more about her in a moment.

The defendant and his wife also continue to raise their biological son, who is now 18 years old. As a father, the defendant's history does not repeat itself with his children. He does not abandon the children. His children, in particular the daughter and his wife, speak to the defendant's character in private much better than I can speak to his character. They speak to the part of him that is not a drug dealer.

Now, winding my way through their writings, you can understand this, was like winding my way through the thicket of a James Joyce novel.

But his daughter in paragraph one of her letter

writes as follows: Honorable Judge, my name is Aryanna Figueroa, and I write to you with the utmost respect and humility on behalf of my father, Michael Kuilan. I am 25 years old, pursuing my bachelors degree in criminal justice at Bureau of Manhattan Community College, and I'm preparing to graduate so that I can attend law school. My ultimate goal is to become a prosecutor, as I believe deeply in justice.

And the rest of her letter speaks for herself. Amazing, when one considers who the defendant otherwise is.

Then his wife. Honorable -- wrote to an earlier judge, but I incorporate it by reference as a writing directed to you: Honorable Judge, my name is Jasmine Kuilan, and I am the proud wife of Michael Kuilan. I am a mother, a grandmother, the owner of Pretty Flame Game Candles, an Amazon associate, and, most importantly, a devoted partner and homemaker. Michael and I have spent 25 years together, recently solidifying our bond through marriage. And I write to you today to share who my husband truly is and the vital role he plays in our lives.

And I don't need to read the rest of what she wrote in her letter.

If character is what happens between closed doors, then they know his character better than anybody. Their letters tell me, and I know they tell you, that the defendant is not just a drug dealer. One cannot read the daughter's

letter addressed to the Honorable Judge without shedding a tear. The irony of ironies, she wants to be a prosecutor. Freud was right. That is reaction forming to the highest degree, to the fact that her father is a drug dealer. Can't make it up, Your Honor.

Jail, to be sure, will specifically deter the defendant. And jail, to be sure, is deserved. That said, the fact that a drug dealer goes to jail will neither generally deter addictive personalities nor will it deter -- generally deter those who make the easy choice to become a drug dealer.

And I know you will permit me to speak freely. If truth be told, and we, all of us, wanted to end this scourge, I paraphrase what another judge once told me: Take the profit out of the narcotics trade by legalizing it, taxing it, and then giving it away. But we're not ready.

In the end, context changes everything. The defendant should be sentenced to a similar term of years, as was the codefendant, taking into account that there is no additional minimum on the 922 charge. So here, as in life, context changes everything.

Thank you.

THE COURT: Thank you, Mr. Greenberg.

Mr. Kuilan, you don't have to say anything, but if there's anything you would like to say, I am happy to hear it.

THE DEFENDANT: I would like to say something,

Judge.

THE COURT: Okay.

THE DEFENDANT: I would like to apologize to Cecilia's family, friends, and loved ones for the part I played in this situation. I never wanted this to happen. I know Cecilia is truly missed.

THE COURT: Why don't you take the microphone a little closer.

MR. GREENBERG: Yes.

THE DEFENDANT: I know Cecilia is truly missed, and I am deeply sorry for the hurt and pain that I have caused you all. And today I'm here to take accountability for my actions. Something like this will never happen again in my life.

Thank you, Judge.

THE COURT: All right. Thank you.

I'll hear from the government.

MR. AMIR: Briefly, Judge.

The conduct in this case doesn't need to be overstated. The defendant sold fentanyl-laced heroin that ultimately caused Cecilia Gentili's death. Her death represents the culmination of a decade's long pattern of dealing opioids by the defendant, dating back to the early 2000s. Despite multiple prior convictions and modest sentences, the defendant continued trafficking dangerous

opioids in our community.

Around the time of his arrest, a search of his home uncovered 850 envelopes containing fentanyl. Thousands of lethal doses in his elderly grandmother's home. Alongside those doses of fentanyl were a scale and a firearm.

The defendant's conduct directly contributes to an unprecedented national overdose epidemic that has claimed over 80,000 lives from synthetic opioids in 2023 alone. While the defendant is not solely responsible for this crisis, his choice to perpetuate it warrants the serious punishment reflected in the guidelines.

Moreover, principles of deterrence require sending a clear message that trafficking lethal opioids like fentanyl will result in a serious punishment.

And specific deterrence matters here, too. This defendant has not been deterred from selling dangerous opioids in our community, and this Court's sentence should do so.

I want to briefly address a point made by defense counsel related to what the sentence should be. He argued that it should be no greater than or the same as the codefendant Antonio Venti.

I think as was plain from the last proceeding and the facts in this case, these are not similarly situated individuals. Mr. Venti in many ways was a victim of Mr. Kuilan's drug dealing, himself an addict of the opioids

that Kuilan was spreading. Mr. Venti was not a consistent drug dealer. Nothing like the decades of opioid dealing and gun possession that the defendant had in this case.

I don't doubt that Mr. Kuilan had struggles in his life, but the reality is, he has chosen to spread a very dangerous product in our community, and Cecilia Gentili's death is just one of many loved ones in our community who are dying from overdoses. So we would ask this Court to impose a guideline sentence. And later in the proceeding we would ask to be heard on the issue of restitution and remand.

THE COURT: Okay. Thank you.

I understand there are family members who want to be heard.

MR. AMIR: Yes, Your Honor. I believe the victim's partner is here and would like to speak.

THE COURT: Okay.

MR. SCOTTO: I think I can speak loud enough for everybody to hear me.

THE COURT: It's a really deep courtroom. You'd be surprised.

MR. SCOTTO: Okay.

Thank you. Thank you for everybody for letting me speak today, and it's difficult for me. And I don't think anybody could expect me to have sympathy in this case.

You know, this is my victim impact statement, what

happened to me when I lost the girl I woke up with every single day for the last ten years. It's painful.

Cecilia and I, we lived a really good life. Cecilia was an angel helping so many people. We laughed every single day. If anybody has seen her on Pose, or in her Broadway show, or read her book, or her stand-up comedy, we laughed every single day. From my part, it is painful. Even today, it still hurts me so much to be here.

And then it's not just me. Cecilia was a huge part of the trans community that's under attack every single day. This morning I was looking at my news feed, and some kid somewhere in the country who is like 12, was wearing a shirt, "there are only two genders," to school. And the school board said, you can't wear that shirt in school. And apparently that's going to go to the Supreme Court. And it is really -- it is so hateful to wear something like that. Those kids that are in the school, those kids that might be trans or trying to figure it out for themselves, like we all did, like we were all bullied in school, everybody has a story, they might have reached out to Cecilia. They might have seen her work, her continued work, and said, wow, I can do this. And that's what the light Cecilia was for so many people in this city.

I said before when I stood before this Court, there were 1,400 people at her funeral. We packed St. Patrick's Cathedral. And, yes, there was some drama with it, but the

love was there.

We had love in our home. Yeah, she was addicted. And I wish she came to me and told me. And I live with that.

In a few days, next week will be a year and a half without her. And I am not the only one that cries for her. There are so many people in this city, I think in this country. I have gotten phone calls from France and Italy from people that loved her.

So, yeah, it's hard for me to have sympathy, Your Honor. It really is.

Thank you.

THE COURT: Thank you.

Mr. Amir, anyone else need to speak?

MR. AMIR: No, Your Honor.

THE COURT: I have considered all of the sentencing factors under 3553(a), including the advisory guidelines.

Mr. Kuilan, it's as if you were dealing with hand grenades where the pins were pulled out halfway. This was something waiting to happen. The number of packets of fentanyl in the apartment that were found, how many people could have died from that. In a way, Ms. Gentili saved a lot of people by being the first and having you caught before the rest of that poison could be distributed and who knows how many more would have died before it was stopped. And you've kind of been heading in that direction your whole life. Well,

20 years, anyway. It is not as if heroin is safe. You know, obviously, I know you didn't want anybody to die, but you were so reckless that it really -- it's like not even a surprise that something like this happened.

And, you know, Mr. Greenberg said, well, you were a semiprofessional dealer. You were pretty professional. You had a lot of drugs, you had weapons, you had ammunition, and it was all ready to go. Just like a weapon on the verge of exploding.

I'm taking into account a very difficult upbringing on your part. I really am. I wouldn't wish it on anybody. And I appreciate Mr. Greenberg's point that, in a way, the road in front of you is laid out by that upbringing.

But not completely true because there's other people with those disadvantages that do overcome them or at least don't succumb to them so completely as you did where you put other people at risk. Again, not with the intention of killing anybody, but definitely knowing that you were putting them at risk.

When we look at the statutes, one of the factors I have to consider is specific deterrence. When I'm dealing with someone who is seriously addicted like you are, I have to factor that in when they tell me I'll never do anything like this again. Because you're not totally in control of what you're doing. We're going to see to it that you get

treatment. And I hope you do. And I hope that it works and you can deliver on the representation you made to me today. But I can't put too much weight on that because, like I say, you're not totally in control. And I have got to put in a sentence that's going to make sure you don't do this again.

Another factor I have to consider is general deterrence. And I think Mr. Greenberg is correct when he says the life of a trans person isn't worth any more than anybody else's life. All people are entitled to live. But the loss of this life, as we just heard, this was a particularly serious loss because this was a person who was so prominent in, as the government phrased it, a marginalized community, and there was so much hurt around this particular loss. Not just a family member, but someone who reached so far to people and could have done so much more.

And so I don't want to say I'm making an example of you. I'm really not looking to do that. But in terms of general deterrence, I do want to send a message out to other drug dealers that when you deal in this poison, you might wind up right where Mr. Kuilan is winding up, and you better be aware of it.

Finally, I want to note that I agree with the government that Mr. Venti was not at all comparable, for a lot of reasons, but including among them those that the government stated. He just didn't have guns, he didn't have the quantity

of drugs.

I will say, I feel badly for Mr. Kuilan's family, and I am discounting the sentence because of that, because of his drug addiction, somewhat. But, you know, the amount of the discount compared to the seriousness of the crime and the circumstances of the offense and the harm that was done, there's not much I can do for the family. It's going to be a long time before they can get him back. And that's just because, like I said, the seriousness of the crime and the circumstances of the offense.

For all of those reasons, I'm going to impose a sentence on Count 3 of 228 months of custody, on Count 4, 180 months of custody. Those are to run concurrently.

There will be three years of supervised release.

The restitution is in the amount of $24,482.04.

Does the government have any quarrel with that?

MR. AMIR: No, Your Honor. We would ask that it be imposed joint and severally with the codefendant.

THE COURT: Okay. That is the way it will be done. That's due immediately and payable at a rate of $25 per quarter while in custody, and then 10 percent of gross monthly income while on supervised release.

The supervised release, I think I said, for both counts will be concurrent and running three years.

There are a number of conditions that were listed in

the presentence investigation report. Two, principally. Compliance with the restitution order and financial reporting to the Probation Department, as well as a search condition.

Mr. Greenberg, do you want me to articulate those fully or can I incorporate them by reference from the PSR?

MR. GREENBERG: Please incorporate them by reference in the writing.

THE COURT: All right. They are so incorporated as if I had orally articulated them here.

In addition, I will impose a 200 dollar special assessment, a hundred dollars per count.

I will not impose a fine because I do not believe that he can afford it.

I have open counts.

MR. AMIR: You do, Your Honor. And I would also -- I would ask that the Court dismiss the open counts.

THE COURT: That motion is granted.

Anything further before I advise him of his appellate rights?

MR. AMIR: Yes, Your Honor. You signed a forfeiture order. We would ask that you just orally pronounce that that is incorporated by reference in the judgment.

THE COURT: Yes. The forfeiture order was how much?

MR. AMIR: I have it here. One moment.

The forfeiture order is for $30,000, as well as the

seized firearm in the case.

THE COURT: Okay. That has not been paid yet, right?

MR. AMIR: No, Your Honor.

THE COURT: All right. Forfeiture in the amount of $30,000 and the seized firearm are part of the sentence, and a copy of the order of forfeiture will be annexed to the judgment.

Anything else? You wanted a remand?

MR. AMIR: Yes, Your Honor.

We would ask that the Court remand the defendant today. I think the standard under 18 United States Code, Section 3143(a)(2) provides that someone convicted of the offense to which this defendant has been convicted, this drug offense, must be detained unless they demonstrate both a substantial likelihood of a successful post conviction motion and clear and convincing evidence that they do not pose a flight risk or a danger. I think those are not -- that is not something the defendant can meet here.

As to the matter of the substantial likelihood of a successful post conviction motion, he has essentially pleaded guilty and waived a challenge, pursuant to his plea, and his conduct, both in the offense conduct reflects dangerousness and his conduct around the time of his arrest, destroying a phone, his conduct on pretrial services where he essentially

left his home to buy cigarettes in contravention of his home detention, none of those suggest clear and convincing evidence that he is not a flight risk or not a danger. And so we would ask that the Court remand the defendant today.

THE COURT: Well, as I understand your construction of the statutes, it really doesn't matter whether he's a flight risk or poses a danger because there's no substantial likelihood that a motion for acquittal or new trial will be granted, right?

MR. AMIR: I agree.

THE COURT: What about that, Mr. Greenberg?

MR. GREENBERG: Well, I agree with that point, Your Honor.

THE COURT: It is moot, really, the second point.

MR. GREENBERG: Yes. Yes, it is moot. It is moot. But, Your Honor, he should be permitted to self-surrender. I have known Michael Kuilan for -- I've been practicing 34 years. I have known him for about 20 of those years.

When he contacted me about this matter, I fully informed him that he was likely to be remanded, that if the case truly went very far south, he could wind up in prison for life. Notwithstanding me advising him of those possibilities, and I told him they were likelihoods, he voluntarily surrendered. And, frankly, that's -- the fact that he voluntarily surrendered, armed with that information, tells

you everything you need to know about whether or not he will return to court.

And he also knows further that should he not -- in the unlikely event that he never returned on his own motion to court, then he could wind up with a life bed, or two or three.

THE COURT: But, Mr. Greenberg, the problem, like we just said, is that when the government invokes 3143(a)(2), those considerations really aren't relevant. In order for me -- remand is mandatory unless I find not only that he's not a flight risk and he'll return, but that there's a substantial likelihood that a motion for acquittal or a new trial will be granted and I can possibly find --

MR. GREENBERG: If that conjunction --

THE COURT: It's "and."

MR. GREENBERG: It's an "and."

THE COURT: It is an "and."

MR. GREENBERG: Well, I would ask you to use your discretion --

THE COURT: I don't think I've got discretion.

MR. GREENBERG: -- and read it as an "or" and allow him to self-surrender.

THE COURT: I don't think my discretion extends to rewriting the statute.

Does the government see it any differently than I am? Is "and" possibly an "or"? Do I have discretion?

MR. AMIR: Your Honor does not. I think that the only time where courts have escaped from this mandatory structure is in reliance on a separate provision of the statute dealing with extraordinary circumstances. I don't think those are present here, in any event. We cite them in footnote 4 of our brief. It's 18 United States Code 3145(c). I just don't think this is a case that involves any extraordinary circumstances.

THE COURT: Well, you want to take a shot, Mr. Greenberg? Is there anything --

MR. GREENBERG: Thank you, Your Honor.

THE COURT: -- extraordinary?

MR. GREENBERG: It is extraordinary that when I told him he would in all likelihood be remanded, and when I told him that if the case went far south he could wind up in prison for life, that he came in under his own steam.

And when he was arraigned, the judge specifically on the record recognized that the reason he was being enlarged on bail, if that's an apt way for me to put it, was the fact that he came in under his own steam.

THE COURT: Yeah. That's commendable, but it's not extraordinary. I don't think I have a choice.

I am going to issue an order of remand, and he'll be remanded now.

Mr. Kuilan, you have waived your right to appeal

your conviction and sentence by virtue of the agreement you made with the government, but if you think anything was fundamentally wrong with the proceedings leading up to that, or wrong with this proceeding today and you want to attempt to appeal, you can attempt. In order to do that, you have to get filed what's known as a notice of appeal. That's a single piece of paper that simply gives the Clerk notice that you're appealing.

Mr. Greenberg will no doubt file that for you if you ask him to. If you certify to the Clerk of the Court that you can't afford a lawyer, the Clerk will file it for you, or you can get the one page piece of paper yourself and file it. But however you delegate it, it remains your responsibility to see to it that it gets filed in 14 days, because if it doesn't, any possibility that you might have of appealing will have been forfeited.

MR. GREENBERG: Judge, regarding that, he will not be able to afford appellate counsel. We will ask the Clerk --

THE COURT: Well, you can file the notice of appeal, or the Clerk can file it, and then the Second Circuit will appoint someone for him.

MR. GREENBERG: Can I ask the Clerk to file it?

THE COURT: Sure. Absolutely.

MR. GREENBERG: Am I doing that right now?

THE COURT: No.

MR. GREENBERG: I'm not asking your clerk to file it. Asking the Clerk.

THE COURT: That you can't. You have to go down to the Clerk's Office and ask that.

MR. GREENBERG: All right, then.

THE COURT: Anything further?

MR. AMIR: Not from the government.

Thank you, Judge.

THE COURT: All right. We are adjourned.

MR. GREENBERG: Judge, can he say a temporary farewell to the family?

THE COURT: Yes.

(Proceedings concluded at 4:47 p.m.)

* * * * *

**REPORTER'S CERTIFICATE**

I, ANNETTE M. MONTALVO, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings.

Dated this 31st day of July, 2025.

/s/Annette M. Montalvo
Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter