UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>MICHAEL KUILAN and ANTONIO VENTI,<br>Defendants. | Case No. 1:24-cr-00130-BMC-1 and 2<br><br>Brooklyn, New York<br>April 1, 2024<br>2:47 p.m. |

TRANSCRIPT OF ARRAIGNMENT HEARING
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Adam Amir, Esq.<br>U.S. Attorney's Office<br>271-A Cadman Plaza East<br>Brooklyn, NY 11201 |
| For the Defendant:<br>(Michael Kuilan) | Nancy Tang, Esq.<br>Howard Greenberg, Esq.<br>86 Court Street<br>Brooklyn, NY 11201 |
| For the Defendant:<br>(Antonio Venti) | Joseph A. Turco, Esq.<br>Turco Law<br>65 Oriental Blvd<br>Brooklyn, NY 11235 |
| Also Appearing: | Mr. Bartola, Special Agent<br>Elizabeth Pabellon<br>Denise Rivera |
| Clerk: | SMY |
| Court Recorder: | Electronic Sound Recording |

Transcription Service: Chris Hwang
Abba Reporting
PO Box 223282
Chantilly, Virginia 20153
(518) 302-6772

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**INDEX**

Page
Court's Ruling 59

(Call to order at 2:47 p.m.)

THE CLERK: 247. All right, this is a criminal cause for arraignment on the indictment in USA v. Michael Kuilan and Antonio Venti, case number 24-CR-130.

May I have attorneys state their name for the record appearing for the Government?

MR. AMIR: Good afternoon, Your Honor, Adam Amir for the United States.

THE CLERK: Thank you.

And appearing for Mr. Kuilan?

MS. TANG: Good afternoon, Your Honor, Nancy Tang of counsel to Law Office of Howard Greenberg, 139 Court Street, Brooklyn, New York for Mr. Kuilan.

THE CLERK: Thank you very much.

And appearing for Mr. Venti?

MR. TURCO: Good afternoon, Your Honor, I'm Joseph Turco, 65 Oriental Boulevard, Brooklyn for Mr. Venti.

THE CLERK: Thank you, Mr. Turco.

Okay, Judge Bloom.

THE COURT: So let the record reflect that the Government has sent a letter to the Court in support of an application for a permanent order of detention for Mr. Kuilan and Mr. Vente.

Ms. Tang and Mr. Turco, have you both received that letter?

MS. TANG: Yes, Your Honor.

MR. TURCO: I have not.

THE COURT: Mr. Amir, do you have a copy of the letter?

MR. AMIR: I do. It was emailed and I'll deliver a hand copy now.

THE COURT: And could I just ask Ms. Tang because there's another mic on the table, why don't you pull that one closer to you and your client? That would be great. Thank you so much. And you've probably heard in the prior appearances I do expect the lawyers to stand, although the clients can remain seated.

Okay, so first let me start, Mr. Kuilan and Mr. Venti, the purpose of today's proceeding is to make sure that you understand that the grand jury has returned an indictment against both of you for four counts in this indictment.

I'm going to ask you both the same questions. Mr. Kuilan, have you had a chance to review the indictment that's been handed down against you with your attorney?

MR. KUILAN: Yes.

THE COURT: Can you pull the mic over to Mr. Kuilan, please? Have you had the chance to review it with your attorney?

MR. KUILAN: Yes.

THE COURT: And do you understand the charges that

are being made?

MR. KUILAN: Yes.

THE COURT: I'm having trouble hearing you through the mic.

MR. KUILAN: Yes.

THE COURT: Ms. Tang, can you just make sure the green light is on?

MS. TANG: It is, Your Honor.

THE COURT: Okay. And Mr. Kuilan, has Ms. Tang advised of you of your constitutional rights?

MR. KUILAN: Yes.

THE COURT: And Ms. Tang, have you had the opportunity to review the indictment with Mr. Kuilan?

MS. TANG: Yes, Your Honor.

THE COURT: And please stand.

MS. TANG: Apologies, yes, Your Honor.

THE COURT: And does he understand the charges that are being made against him?

MS. TANG: Yes, he does, Your Honor.

THE COURT: Have you advised him of his constitutional rights?

MS. TANG: Yes, Your Honor.

THE COURT: Do you wish me to read the indictment aloud?

MS. TANG: No, Your Honor.

THE COURT: And is your client prepared to enter a plea?

MS. TANG: Not at this time, Your Honor. Oh, I'm sorry, he enters a plea of not guilty, Your Honor.

THE COURT: A plea of not guilty shall be entered on behalf of Michael Kuilan to all counts in the indictment pertaining to him.

Now I'm going to you, Mr. Venti. Mr. Venti, have you had the opportunity to review the indictment that's been handed down against you with your attorney?

MR. VENTI: Yes, Your Honor.

THE COURT: Do you understand the charges that are being made against you?

MR. VENTI: Yes.

THE COURT: And now Mr. Turco, have you had the opportunity to review the indictment with your client?

MR. TURCO: Yes, I have, Your Honor.

THE COURT: Do you believe he understands the charges?

MR. TURCO: He does.

THE COURT: Have you advised him of his constitutional rights?

MR. TURCO: I have.

THE COURT: And does he wish me to read the indictment aloud?

MR. TURCO: He waives that right and is authorizing me to enter a plea of not guilty.

THE COURT: A plea of not guilty shall be entered on behalf of Antonio Venti to all counts in the indictment pertaining to him.

Sorry to go back to you, Ms. Tang, on a housekeeping matter. Have you filed a notice of appearance in this district?

MS. TANG: Not on this matter, Your Honor.

THE COURT: Well, you have to, because you're standing up and speaking on behalf of a client. Just because Mr. Greenberg may have filed and you work under him, the Court has to make sure that you are admitted in this district and that you get notice of anything that's filed in this district. Are you admitted in this district?

MS. TANG: Yes, Your Honor.

THE COURT: So I'll expect you to file the notice of appearance by the end of the day, okay?

MS. TANG: Yes, Your Honor.

THE COURT: Thank you.

All right, so both Mr. Kuilan and Mr. Venti have been arraigned on the grand jury's indictment. I would love it if the Government could put on the record Mr. Kuilan and Mr. Venti were both arrested about a week or so ago.

At that time, Judge Kuo had granted them release on

conditions that are set forth in bonds in each of their cases. And now the Government is saying that they should be held until their trial.

So why don't you put on the record what your application is since it's clear Mr. Turco didn't get a chance to review it until he came into the courtroom today. Thank you.

MR. AMIR: Absolutely, Judge. So the Defendants were initially charged on complaints from -- as to Mr. Venti, it was a charge of distributing Heroin and Fentanyl.

And as to Mr. Kuilan, it was a complaint charging distribution of Fentanyl and Heroin and the unlawful possession of a firearm.

Those were sort of our initial understandings of the case, but since then, we have been investigating. And the grand jury, as the Court knows, did return a charge that not only did these Defendants distribute Heroin and Fentanyl, but that their distribution led to the death of Cecelia Gentili, who is a pillar of the LGBT community in New York and a New Yorker who deserves justice.

And so, it substantially has changed the circumstances in which we find ourselves and the circumstances in which the Defendants find themselves.

If the Court would like, I can go ahead and just walk through our detention argument, you know, beginning I think

first with the presumption that applies here.

So because this is a drug charge under the Controlled Substances Act with a high penalty, there is a presumption that of detention under Title 18, United States Code 3142(e)(3)(A).

THE COURT: And I'm sorry I don't mean to interrupt, but wasn't it --

MR. AMIR: Oh, please.

THE COURT: -- also a presumption case when you presented your opposition to any release to Judge Kuo?

MR. AMIR: To be clear, we did not oppose release at that time because based on what we knew at the time, it was a simple distribution case.

And it is only now after having developed the evidence and having the grand jury return the overdose do we believe that detention is warranted.

And so, while the Court is correct, I think the basis for the presumption that there's a very high sentence and the danger of drugs is cast into clearer relief when there is an overdose charge that has a range of 20 years to life imprisonment, a far cry from the prior sentences that apply and a far cry from the dangerousness presented at the complaint stage.

THE COURT: But when you were making your initial pronouncement to me today, you were saying it's under 3142, what section?

MR. AMIR: (e)(3)(A). And you're correct. It does apply to simple distribution as well. But I think the -- as far as their ability to rebut that presumption, it is much harder in a case where we've identified not only near distribution, but that someone has died as a result of that distribution.

THE COURT: Well, I'm not in any way disputing that it's a very serious charge --

MR. AMIR: Sure.

THE COURT: -- and now they've been indicted. And if there is a presumption of detention, you have to show that there's a serious risk of nonappearance by a preponderance or a serious risk of danger by clear and convincing evidence. And again, they still have the chance to rebut, even if there is a presumption of detention.

MR. AMIR: That is absolutely correct.

THE COURT: So please give me what your showing is regarding each of these Defendants. Let's start with Mr. Kuilan.

MR. AMIR: Sure, I just briefly on the standard want to just to clarify one thing. As I understand it, the burden is still on the Defendants to rebut the presumption --

THE COURT: That's true.

MR. AMIR: Yeah.

THE COURT: But since you're standing --

MR. AMIR: Absolutely, Judge.

THE COURT: -- I figured we could save time and hear from you as to whether you're making the argument based on both serious risk of nonappearance and dangers -- risk of danger because it is an either/or. It could be either --

MR. AMIR: Sure.

THE COURT: -- but it could be both. And since there are different standards that apply, I figure we can just get that out front, so that when they're rebutting that they'll try to address the issues that you've raised. Go ahead.

MR. AMIR: Yes, Your Honor. So I'll begin per the Court's instructions as to Mr. Kuilan. So I think the danger in this case is manifest that he poses. The drugs he distributed to Mr. Venti, which were then sold to Ms. Gentili led to her death.

And following our initial development of the evidence in this case, we did execute a search warrant on Mr. Kuilan's home. We found hundreds of baggies of Fentanyl that weighed over 30 grams.

As we understand the literature, micrograms worth of Fentanyl can constitute a lethal dose. So we're talking about thousands upon thousands of lethal doses in his home.

And not far from that bag of Fentanyl, there was a handgun and ammunition. So we think that this -- that these kinds of facts are, you know, in the heartland of what we view

as danger to the community, guns and Fentanyl.

And I would also note that the transactions that happen in this case occurred in residential neighborhoods, dense residential area of South Williamsburg, a block away from a school and a daycare. So these are -- this is where the transactions are happening with highly lethal drugs with a Defendant who is armed.

You know, we would also note that this is not -- that this is not a first time that he's in the criminal justice system. He has prior felony convictions. They're not that recent, so we don't rely as heavily upon them, but we would just note that for the Court as well.

THE COURT: There is a federal charge for distribution of drugs within a certain area of a school. That's not at issue here though.

MR. AMIR: We could have charged it. We did not. We could at a later date.

THE COURT: Okay, do you want to make the argument as to -- that was to dangerousness. Do you want also cover serious risk of nonappearance?

MR. AMIR: Yes, Judge. So we think the Defendant Mr. Kuilan's conduct after the search warrant execution is indicative on this point.

He essentially fled from another residence. He went into hiding for several days. He eventually did meet with law

enforcement and the Government with an attorney present in which he admitted to destroying --

THE COURT: He arranged for that meeting?

MR. AMIR: Yes, Defense counsel did reach out to the Government and a meeting was arranged. And obviously, that can cut both ways because he did eventually surface. So I want to be fair about that point.

THE COURT: How close in time to when his -- I don't know, did they search his residence the time that he fled from the residence? I'm unsure of how this all came down?

MR. AMIR: Fair enough. So, on or about March 12th, his -- the residence he shares with his grandmother in South Williamsburg was searched.

The Defendant himself was not home at that time. He was at what appears to be his girlfriend's apartment. And we understand from the agents having reviewed surveillance video at the girlfriend's apartment that shortly after the agents entered the grandmother and the Defendant's home, he is seen leaving very early in the morning.

THE COURT: He is seen leaving the girlfriend's --

MR. AMIR: The girlfriend's apartment.

THE COURT: -- home?

MR. AMIR: That's correct. And his phones were turned off. Agents had tried to reach out to him. And he essentially went into hiding for a couple days and then re-

surfaced through this attorney.

And when he met with the Government a couple -- three or four days later approximately, he admitted to destroying a phone and assured the Government that he would find another phone that we know is used in furtherance of the scheme, but he was met -- he never provided that phone. And our analysis of the toll and PIN register records indicate that that phone was deactivated or destroyed.

So we're --

THE COURT: But what I'm asking about, and I'm sorry, Mr. Amir, for interrupting, but serious risk of nonappearance does not go to things that have already happened in the past.

So he's already destroyed that phone if he destroyed it. And you'll use that for whatever it's worth during the prosecution, but serious risk of nonappearance goes to will he flee and not come back to face these charges?

And again, I'm not trying to say that I'm deciding any of it, but if he still resides with the grandmother and looking at the bond that had been set by Judge Kuo, which I have a copy of, it looks to me that he's on home detention restricted to his residence at all times. This is what I have that he can't speak to his co-conspirators or any drug buyers and sellers. That he has to undergo testing and evaluation for substance abuse, which Pre-trial has already reported that there were drugs in his system, but he had said that when he

was first interviewed that he's been taking drugs for quite some time.

So, again, I understand we're in a different ballgame now because he's been tied potentially to a death in the community.

So I get the seriousness, but as far as the order setting the conditions, if you've reviewed the addendum to the Pre-trial Services Report, their recommendation has not changed to the Court.

And so, it would take something to really move me. Maybe we need to increase the amount of the bond. It was $100,000 bond with four suretors.

I'm expecting that Ms. Tang will be able to tell me exactly who those four suretors are. And if the grandmother didn't sign on, it might be that we have to get the grandmother to sign.

MR. AMIR: Yes, Judge, so I --

THE COURT: Because somebody goes straight to hell if they get their grandmother's house taken away by the Government. That's a sure thing. It's written everywhere that if the grandmother signs, and he tries to flee, and the Government goes after to take the grandmother's house, that's it.

MR. AMIR: Certainly, Judge. I think just to respond to the Court's concerns about nonappearance, I do think the

courts have determined acts of obstruction or flight are relevant to determining will someone not appear in the future.

THE COURT: But that happened before he saw the Government for the first time it sounds like. He was tipped off because he was at his girlfriend's house, that the Government had agents at his grandmother's house.

He may have had phones with him. I'm not trying to say this is a good thing and this could certainly be used against him, but that's not for me to decide today but if he's already deep sixed the phones that you thought would be relevant here, there's nothing I'm going to do about that today.

My real concern is will he come back to face these charges? That's my real concern on that prong of whether or not he should be detained, whether or not there is a serious risk of nonappearance.

And again, as I said, I wasn't here when Judge Kuo set the bond, but she knew some of this information, maybe not the full extent of what the grand jury has now returned.

MR. AMIR: Yeah, just to clarify one point that I may have inartfully mentioned, that there is one detail that was -- is new since his arraignment before Judge Kuo.

And the -- and just for clarity, the Kuo, you know, there was no argument on detention so the facts were not fleshed out because the Defense counsel and the Government

agreed to the package.

But since then, we received assurances that the Defendant and the family were trying to locate this other phone. And since then, we've been able to see that phone has been essentially deactivated. We assume it has been destroyed.

So I would just focus the Court on perhaps that as most useful example because it comes after the arraignment and after his appearance.

So I understand there's other -- that the instruction is maybe not the most relevant for the Court as to nonappearance, but just to clarify that one factual detail. And then, I can speak more directly to nonappearance.

THE COURT: Okay, go ahead.

MR. AMIR: So just on the nonappearance point, you know, we think the equities, if you will, have changed significantly and the incentives have changed significantly.

The Defendant went from facing a sentence of zero to 20 years. Now, of a sentence beginning with 20 years if convicted at trial of the overdose. So he faces 20 years to life.

And as the Court knows, many decisions in the 2nd Circuit and in this circuit and the district courts have found that high sentences create an incentive to flee and are a proper basis to find that there is a intolerable risk of flight.

And you know, I know the Court has flagged the home detention and the location monitoring. And while those are important, they're not fail-safes. I think as the 2nd Circuit recognized in Milan (phonetic) or Judge Gleason in the Benetar case, you know, they essentially prevent the Defendant or the supervisee from getting a headstart, but they are not foolproof and --

THE COURT: But let me just ask you --

MR. AMIR: Sure.

THE COURT: -- he spent a lifetime in this community, where is he going? Didn't they take his passport? I believe they did.

I know that you could always get something if you need it, especially in our community if somebody is hell-bent on getting out of here, they'll be able to, but again, I'm not trying to question the Government's concerns here, the concerns are real.

But again, his passport has been surrendered. He's not going to obtain another passport. He's on home detention at all times.

I would like to know, so Ms. Tang, did his grandmother sign this bond? Ms. Tang?

MS. TANG: Yes, apologies, Your Honor.

THE COURT: Stand.

MS. TANG: Yes, apologies, Your Honor.

THE COURT: Did his grandmother sign this bond?

MS. TANG: She did, Your Honor.

THE COURT: And what's her name? Margarita Garcia (phonetic)?

MS. TANG: Yes, Mar --

THE COURT: So I do have her signature. And if the Government thinks that we need more of a bond from the hundred, we could get the four signatories to the bond to consent whether it be in person or by phone that we put the number up to a different number.

But again, to say that he has to spend the next X amount of months in jail and that there are no conditions, that's a high bar for the Court.

Again, even with the presumption and I will make them make their arguments to rebut the presumption, but under these circumstances where a week ago, my esteemed colleague, who is way smarter than me, made a determination that there were conditions that could be set in place even though there is a change now because there's an indictment and the charges that their drug dealing led to the death.

I hear you. I understand that the victim is entitled to get justice as well, but we're not there yet. We're still at a preliminary stage of these proceedings.

You've made your case that the presumption has been met. So let me hear from the Government, and then, I'll come

back to you with regard to Mr. Venti.

MR. AMIR: Yes, Judge.

THE COURT: Ms. Tang?

MS. TANG: Yes, Your Honor.

THE COURT: You're making your case for why the conditions of release that were set previously should remain in place and why you can rebut the presumption that arises in a case where there's now a 20 year to life potential sentence.

MS. TANG: Yes, Your Honor. Your Honor, if I may. Your Honor, I'm requesting this Court to consider the option of continuing Mr. Kuilan's house arrest or granting release on his own recognizance.

THE COURT: There's no way he's being released on his own recognizance. So get that out of your mind.

MS. TANG: Yes, Your Honor. It is imperative to underscore the fact that prior to appearing before this Court, Mr. Kuilan was subjected to house arrest, a condition he met not just with compliance, but with exemplary behavior that reflects both --

THE COURT: It's only been a week. Don't read a prepared script. Address the Court with my concerns. My concerns are that the Government has said he's a danger to the community. He's dealing Fentanyl and he lives close to schoolyards.

MS. TANG: Sure.

THE COURT: Okay, they did raid his house. They did take the gun. They did take the drugs. But anybody who had access to those things could get them again. And even being locked in his grandmother's house, it doesn't prevent people coming to see him.

MS. TANG: Understood, Your Honor. Your Honor, we believe there's no risk of nonappearance. And Mr. Kuilan poses little to no threat to the community. Because I understand it's been a week, but he has fully complied. He has an ankle monitor on.

Furthermore, Pre-trial Services --

THE COURT: He drug tested positive.

MS. TANG: And I will address that. Your Honor, with regard to the drug test, marijuana and cocaine from a drug test on March 21, 2024 were found in his system. The Pre-trial sentence -- I'm sorry, the Pre-trial Services Report that Mr. Kuilan admits he got high before he surrendered himself on March 19, 2024.

As per medical research online, cannabis remains in the system for seven to 30 days in urine and cocaine from three to four days.

THE COURT: Again, I'm really commenting on that you say he's been fully complaint. And one part of being compliant is that he does nothing that breaks the law. And doing drugs, so you're saying both the cocaine and the marijuana were still

in his system. Okay, let's assume that's true.

Now move on and rebut this presumption that the Government has that he's going to try to flee because instead of it being a zero to 20 year sentence that he's facing, he's now facing with an indictment a 20 year to life sentence.

MS. TANG: Sure.

THE COURT: And the obstruction that the Government is alleging, which the Court can consider even though it has not yet been charged in the indictment. It's been proffered.

MS. TANG: Yes, Your Honor. Your Honor, it's our understanding that the Government's version to the facts including allegations of Mr. Kuilan attempting flight and destroying a phone are grossly inaccurate or incorrect. That is not our understanding. And if a hearing could be heard on the destruction of evidence, we will would proceed that way.

Furthermore, Mr. Kuilan, despite being indicted, still has the presumption of innocence. Mr. Kuilan is a 44 man (sic). He was born and raised in Brooklyn --

THE COURT: Ms. Tang?

MS. TANG: Yes.

THE COURT: I understand that you've been asked to stand up for somebody else in this Court. You don't need to address the things that I'm not disputing. Did you hear me say to him he spent his lifetime in this community, where is he going?

MS. TANG: Yes.

THE COURT: So you're telling me his 44 and he's always lived here, that doesn't help the Court make a decision. Be a good lawyer. Listen to what I'm asking about, okay? Don't just say things that you have on a script for yourself. That doesn't help me.

MS. TANG: Understand, Your Honor. And with regard, again, with regards to the alleged destruction of evidence, those are just allegations. We have different versions of the facts and we believe they should be brought out in a hearing when it comes to that.

THE COURT: Who are the other three people? His grandmother has signed on to the bond. There are three other people. Who are his --

MS. TANG: His mother, his girlfriend.

THE COURT: His who? His who?

MS. TANG: His mother, his girlfriend, his grandmother, and a close friend of the girlfriend. Furthermore --

THE COURT: All women.

MS. TANG: Yes.

THE COURT: Isn't that -- not surprising to me but --

MS. TANG: And again, as Your Honor is aware, his --

THE COURT: What does his mother and grandmother do?

MS. TANG: His grandmother is 85 years old. I

believe she's not employed. She --

THE COURT: Does she own the house?

MS. TANG: Yes, she does, Your Honor.

THE COURT: And does --

MS. TANG: She owned the house for 20, 30 years.

THE COURT: And does the grandma -- the grandmother lives there. The mother also lives there it looks like.

MS. TANG: The mother does not live there.

THE COURT: We have a Margarita Garcia at 323 Bedford Avenue, 5R. And we have an Elizabeth Pabellon at 323 Bedford Avenue, 6A.

MS. TANG: Your Honor, these are apartment units. The grandmother I believe is in some co-op (indiscernible).

(Counsel confers with the Defendant)

MS. TANG: She owns -- they own the apartment. So the grandmother owns her apartment unit.

THE COURT: Okay. And the mother lives at the same address in a separate apartment unit?

MS. TANG: That's correct, Your Honor.

THE COURT: And the grandmother only owns her apartment?

MS. TANG: Yes, Your Honor.

THE COURT: How big an apartment is 5R?

MS. TANG: Two bedroom, Your Honor.

THE COURT: So you're in one bedroom and your

grandmother's in the other bedroom? And you're on house arrest there?

And your 85-year old grandmother had to sign a bond for you for you to get out jail. What does your mother do for a living?

MR. KUILAN: My mom just recently retired.

MS. TANG: His --

THE COURT: What did she do before she retired?

MR. KUILAN: I believe bookkeeping.

THE COURT: And how about I guess Denise (phonetic) is your girlfriend?

MR. KUILAN: Yes.

THE COURT: What does she do for a living?

MR. KUILAN: I think she works for some lawyers.

THE COURT: She works for some lawyers.

MR. KUILAN: Yeah, she works for lawyers.

THE COURT: And then, Rebecca Mejia (phonetic), who is your girlfriend's friend?

MR. KUILAN: Yes.

THE COURT: And what does she do?

MR. KUILAN: She works for a charity place.

THE COURT: Do you have anything else you want to tell me, Ms. Tang, about the Government's arguments since you did get their letter prior to coming on for this proceeding?

MS. TANG: Yes, Your Honor. If I may, I don't

believe that letter takes into the effect of his incarceration on the grandmother. The grandmother's 85 years old with multiple health condition. She survived throat cancer and now has an electronic --

THE COURT: If you're asking me to let him out, you're not reading the tea leaves well here. I'm inclined, again, to put a stiffer penalty on, not reduce what has already been put in place.

The charges now are more serious. So it's not as if you're going to get me to under any circumstances reduce these conditions of the bond.

The only thing you could hope for, Ms. Tang, is that I don't say there's no conditions under which your client can remain at liberty.

MS. TANG: Understood, Your Honor. And so, if I can just turn to the facts of the case?

THE COURT: No, what you should turn to is what you'd be prepared to say to address those two prongs, those two prongs again being danger to the community and the risk of flight. Those are the only risk of nonappearance. Those are the only two things you should really be turning my attention to.

MS. TANG: Okay, with regards to the risk of nonappearance, Your Honor, my client surrendered voluntarily twice. He surrendered on March 19, 2024. It was a voluntary

surrender. He surrendered himself again this morning into custody and now he appears before Your Honor.

THE COURT: So the Marshals did not have to go pick him up?

MS. TANG: He knew the Marshals were coming and he surrendered himself voluntarily.

THE COURT: Okay, Mr. Amir, is that something you know anything about?

MR. AMIR: As I understand it, he was arrested this morning at his home by DEA and NYPD. That's my understanding of the facts. As to the -- today's arrest, it is correct, Defense counsel's correct as to the prior time he did self-surrender.

THE COURT: And DEA agents, are you here to confirm that he had to be arrested today and that he didn't self-surrender?

MR. BARTOLA: Yes, Your Honor, Special Agent Matt Bartola (phonetic). We did conduct arrest warrants.

THE COURT: And was it something that he was notified that he was going to be arrested or it was something that the Government -- in other words, was he given the chance to surrender again? He was on home detention. You knew where to get him. He was arrested I take it at the residence on Bedford Avenue, correct?

MR. BARTOLA: Yes, Your Honor.

THE COURT: So was there any opportunity for him to surrender himself?

MR. AMIR: We did not give the Defendant notice this morning. In light of our concerns after the last search warrant that there may be some attempted flight, we did not want to give him prior notice.

THE COURT: Okay, thank you.

MS. TANG: And Your Honor, if I may?

THE COURT: So he didn't self-surrender today.

MS. TANG: My apologies. I misunderstood that second part.

THE COURT: Well, it's important that I be able to trust whatever you say.

MS. TANG: But he did self-surrender the first time on March 19, 2024.

THE COURT: Yes.

MS. TANG: Furthermore, it's our understanding that Mr. Kuilan was under no illusions about the Government's intention to level these charges against him. We knew they were coming and he just chose not -- he chose not to flee. He has consulted --

THE COURT: Well, if he chose not to flee, because he also has four people signing on to a bond where the Government could go after those people for the full amount of the bond.

So, talk about, you know, his 85-year old

grandmother, you know, again, one of the things that the Court could consider here is having the grandmother put her house -- it's a co-op or it's a condo?

MS. TANG: I believe it's a co-op, Your Honor.

THE COURT: It's more complicated with a co-op. Do you have anything else you want to discuss with the Court?

MS. TANG: Your Honor, we believe he's not a danger to the community on two grounds. One, allegedly, the contraband has been seized. He is no longer in possession of it.

Furthermore, again, he has to stay in compliance so his grandmother does not lose the house. We believe that is a severe enough deterrence to these members of the family who has loved and supported him.

THE COURT: Do we know what the estimate of the house's value is?

MS. TANG: Your Honor, my -- upon information and belief, it was over 1.1 million.

THE COURT: And does the mother also own her unit?

MS. TANG: We do not have that information, Your Honor.

THE COURT: Okay. Anything else from the Government on this?

MR. AMIR: Just very briefly, Judge. I just think it's important to emphasize as to these suretors, there

may -- I have some concerns -- the Government has some concerns about their moral suasion.

Of course, the grandmother lived with the Defendant at this home where he had hundreds and hundreds of bags of Fentanyl and a gun. And the mother lives in the same building. So I just have some concerns about their ability to truly stop him.

THE COURT: I'm sure that's true. And I understand full well what the Government is saying, but there is no allegation that the grandmother was involved in the drug dealing.

And I would imagine that he does have some feelings for his grandmother since he's living in her apartment. And what I am considering doing is making this release order a $250,000 bond.

And I'll get the four suretors to come back on the phone. We could do this tomorrow to tell the Court that they will continue on the bond even though I've raised it to a $250,000 bond with all the same conditions set forth in the bond.

I think in that way, they will understand the import of this, even if it's a million-dollar home, $250,000 is different than $100,000.

And that he should be well aware that his girlfriend, his girlfriend's friend, who are the only working people, his

mother, and his grandmother, the Government will go after all of them. And $250,000 is a lot of money for these people.

MR. AMIR: If I may propose just one modification. Although we still think detention is appropriate, if the Court were inclined to do that, we would ask that some portion be secured just because of the challenge of using property, especially co-ops or property where people reside.

THE COURT: Well, if the grandmother's co-op is put in, I don't know how long it takes for a co-op. I know that, again, that means that the paperwork for your grandmother's house would have to be held in the county, so it's Kings County, courthouse pending the outcome of this trial so that the Government would know that if they were needed to collect $250,000, your grandmother's home would be there waiting.

She couldn't sell or refinance until this proceeding was concluded. So that's called a confession of judgment. It doesn't affect her at all as long as you do what you're supposed to do. It does affect her, however, because they'll go after her first if for any reason you don't live up to your obligations.

MR. KUILAN: I wouldn't do that to her.

THE COURT: I wouldn't think you would. As I said, you go straight to hell if you have your grandmother's house taken from her.

But this would be for Mr. Greenberg to have to get

those papers from your grandmother. It would have to take a week, because again, I can't insist that they file it within a day. They'd have a week to do it, but I'd have all of the suretors come back whether in person or by phone tomorrow to say that they agree to the $250,000, but I allow him to remain at liberty on the bracelet until that time.

MR. AMIR: Understood. We obviously note our objection, but we respect the Court's ruling.

THE COURT: So that's what the best you're going to do, Ms. Tang. Do you understand?

MS. TANG: I understand. Thank you, Your Honor.

THE COURT: And may I just ask, has there been 5(f) warnings given in this case? In other words, has the Government been told to turn over any information whether it goes to guilt or --

MR. AMIR: Punishment?

THE COURT: -- punishment, thank you.

MR. AMIR: Yes, we have. And just in an abundance of caution, we again, swear that we will follow Rule 5(f).

THE COURT: Thank you very much. I'm sorry. I just didn't have the full picture of what happened at the last court conference.

Okay, so Sui May, I think we can just put in the minute order that we're going to have them come on tomorrow. Your choice is either at 11 o'clock to have these people or at

2 o'clock.

THE CLERK: What time would you like?

MS. TANG: 2 o'clock.

THE CLERK: -- the suretors. 2 o'clock?

MS. TANG: Yeah, 2 o'clock.

THE COURT: You have to have all four suretors either by phone or in person here to sign on to the new bond for the same amount, same -- I mean, same conditions but different amount. Do you understand?

MS. TANG: I understand, Your Honor.

THE CLERK: Judge, I probably need you to sign the bond because he actually (indiscernible).

THE COURT: That's fine.

THE CLERK: So I'm just going to give it to you and (indiscernible).

THE COURT: That's fine.

THE CLERK: Put on the minute entry that they could come back tomorrow.

THE COURT: That's fine.

THE CLERK: Okay.

THE COURT: And just to be clear, all the other conditions that Defendant must appear in Court is required; surrender as directed; not commit a federal, state, or local crime while on release; Defendant must co-operate in collection of DNA if it's authorized by law; the Defendant must advise the

Court in writing before making any change in residence. And you are not permitted to make any change in residence or telephone number.

You must not possess a firearm, destructive device, or other dangerous weapon. You must not use or unlawfully possess a narcotic drug or any other controlled substance unless it's prescribed by a licensed medical doctor. And marijuana's still prohibited under federal law.

You must submit to Pre-trial supervision and report to Pre-trial as directed. You're still subject to random home contacts and verification. That you live where you live.

You must notify Pre-trial Services as soon as possible of any arrests. They say you must continue or actively seek employment, but again, you are on home detention. So unless you know there is a job and you've notified Pre-trial that you know you're going to a job or a job interview, you're at home. You've surrendered your passport already I take it; is that correct?

MR. KUILAN: Yes.

THE COURT: And you're not permitted to leave New York City and Long Island. And you may not have any contact with your co-conspirator or any drug buyers and sellers.

And you must undergo testing, evaluation, and treatment for substance abuse as directed by Pre-trial. And you're subject to home detention, restricted to the residence

at all times except for court appearances, court-ordered obligations, attorney visits, or anything else that's approved in advance by Pre-trial.

And you will pay for the cost of that monitoring. And this said that a fourth suretor had to sign by 3/21, but we have all four suretors. And I want it to be absolutely your grandmother.

And I am going to include that it's a $250,000 bond with seven days for her to post her property, meaning with the Kings County Court. They're not going to sell her property. It's just the paperwork on her property.

And that has to be posted by your attorney in Kings County and your attorney will know how to do that. So that's a new condition with a confession of judgment for that amount. It's a $250,000 bond.

And that property is the property at 323 Bedford Avenue, apartment 5R.

MR. KUILAN: 5A, ma'am.

THE COURT: 5A?

MR. KUILAN: As in apple.

THE COURT: Okay, we had it as 5R. And your mother's in 6A?

MR. KUILAN: Yes.

THE COURT: Okay. Thank you for correcting that then. I'm correcting it on the bond.

Okay, so you understand that that would be set up by 2 o'clock tomorrow, Ms. Tang, with all four suretors either in person or on the phone?

MS. TANG: Yes, Your Honor.

THE COURT: And they'll have to understand that the Court is making this $250,000 bond and that there will be a confession of judgment on the grandmother's apartment?

MS. TANG: Yes, Your Honor.

THE COURT: And you'll speak to Mr. Greenberg about getting that confession of judgment filed within a week?

MS. TANG: Yes, Your Honor.

THE COURT: And that has to be given to the Government, the confession of judgment. They just want it to be filed with the state court. That's where the property is, okay?

MS. TANG: Understood.

THE COURT: Okay. So, moving on now, do you want to put your position on the record with regard to Mr. Venti?

MR. AMIR: Yes, Judge. So, in our memorandum, we sought detention as to both. In light of this Court's decision to maintain Mr. Kuilan on a bond of an increased amount, we will not seek Mr. Venti's detention. He is differently situated from Mr. Kuilan in a way that is beneficial to him. He didn't -- he was not found with a gun. We are not aware of acts --

THE COURT: And he doesn't have the same criminal history as well?

MR. AMIR: That's correct. We understand he's employed. And you know, did not have a large stash of Fentanyl in his home.

And we're not aware of acts of obstruction along the lines of Mr. Kuilan. So I think in that case, what we would propose is he's currently not -- does not have location monitoring as a condition of his bond. We would ask that the Court impose that and perhaps increase along the same lines the amount of the bond.

THE COURT: I'm not inclined to do that. Why does he need those increased conditions? Again, he did self-surrender today, correct?

MR. AMIR: That's correct. He was given notice and did show up on time.

THE COURT: Do you want to be heard on this, Mr. Turco?

MR. TURCO: Briefly Your Honor, thank you. I must confess it, felt a little bit like a curveball, but I think I understand why it was presented in this way. My client self-surrendered. My client, nothing was found in his place of residence. He has complied with every order.

THE COURT: Well, again, I'm not trying to make the Government's argument. But since he's in the same indictment

as Mr. Kuilan, I believe that he still now have -- has heightened exposure regarding what his potential sentence would be.

So, not trying to make the argument, but trying to move things along, he previously had a lower potential range on a sentence. And now that is a higher range. Is that correct, Mr. Amir?

MR. AMIR: That is correct. What began as zero to 20 now starts at 20 to life.

THE COURT: So, that is, you know, a concern for the Court of course regarding risk of flight and danger to the community, but I don't hear the Government fighting to the same degree regarding your client as I heard them fighting with respect to Mr. Kuilan.

MR. TURCO: Correct, Your Honor. We more or less rebutted the presumption last week. None of the facts have changed, just the stakes I reckon.

THE COURT: I guess just indulge me.

MR. TURCO: He gave up his phone and -- I'm sorry.

THE COURT: I guess indulge me because I wasn't here last week.

MR. TURCO: Uh-huh.

THE COURT: So when you're saying you rebutted, you can give it to me in summary fashion. I'm pretty quick on the uptake. I did acknowledge that my esteemed colleague, Judge

Kuo, did release your client, but since I wasn't here, if you could just give me how you've rebutted the presumption and why you believe that the conditions set forth in the bond that was agreed to last week should remain in place? Thank you.

MR. TURCO: Yes, well, I have a long list of mitigating factors that I went through. And if you would like, I will do it again.

THE COURT: All I want you to do is make your record of why even though the potential sentence has gone up from zero to 20, to now 20 years to life, that shouldn't affect the Court's determination of the order setting the conditions of Mr. Venti's release.

MR. TURCO: The -- Mr. Venti lawyered up early, remained silent, and did not speak to any co-conspirators or co-defendants. Nothing that -- he has done nothing since last week to change his circumstances.

THE COURT: What is Mr. --

MR. TURCO: I mentioned he gave up his phone immediately.

THE COURT: What is Mr. Venti's job?

MR. TURCO: He's an electrician.

THE COURT: And so, again, your argument is by imposing any of the curfew, home detention, home incarceration, it would impact him in a way that the Court should not consider?

MR. TURCO: Well, it certainly would. The conditions that he -- that were set appear to any reasonable reader to satisfy the concern that he's -- be a flight risk. He's not. And the Pre-trial Report, well, alluding to that recommended that he be released on an unsecured bond, which we executed.

He's got sureties. And they are his sister and his brother-in-law in the house where he lives, they live.

THE COURT: Thank you.

MR. TURCO: That's all I have, Your Honor.

THE COURT: Mr. Amir?

MR. AMIR: We would ask at a minimum that there be location monitoring with a curfew imposed. I don't understand his work to be happening at night. It seems like a moderate imposition on him especially given the seriousness of the charges. And you know, the -- of the victim here. So we think that's appropriate given the risk of flight and the danger.

We know that Mr. Venti has struggled with addiction in the past and that some of this conduct may have arisen from that. And so, having some tools for Pre-trial to monitor his whereabouts we think will be prudent.

THE COURT: Let me be clear. I do not doubt the seriousness of the charges in the indictment. But looking at the addendum to the recommendations that were made last time to Judge Kuo, I don't see that they are asking for these additional tools to monitor Mr. Venti.

And he self-surrendered today. He surrendered the initial appearance. I don't see why we need to have electronic monitoring at this time.

MR. AMIR: So I -- if I may, Your Honor, I understand the -- that point as to perhaps flight, but I don't think it mitigates it as to danger.

I think that this individual has struggled with addiction and has struggled with getting wrapped up with the wrong people and dealing drugs and --

THE COURT: Except that now he has to report to Pre-trial Service, you know, an arm of the Court. He's now, if you haven't already been told this, you're under a microscope, Mr. Venti. And again, having an addiction problem doesn't get solved by electronic monitoring.

MR. AMIR: We just think keeping an eye on his whereabouts could prevent him from dealing again or getting himself in trouble and just is prudent to protect the community. I understand the Court's point, but we respectfully disagree.

THE COURT: I do understand the Government's point. But again, I rely to a great extent on the professionals who advise the Court. And Pre-trial Services has not recommended electronic monitoring in this case.

MR. AMIR: As I understand it, Judge, Pre-trial Services, and they can correct me if I'm incorrect, did not

conduct an additional interview this morning. And so, this is with respect to them, I don't know that this has perhaps fully analyzed all the ramifications.

THE COURT: But what would the additional interview, the initial interview was a week ago. And a week ago, they did speak to his sister, her fiance, they spoke to, you know, he said that he had been hospitalized with a heart attack. He did have a 1995 and 2000, 2007, 2010 arrest. There is, you know, been consideration to his use of illicit substances and his criminal history.

And again, we have two bonafide suretors, who have signed on, who are close to him. I don't see a need at this point for electronic monitoring. If he steps out of line at all, the Court will not hesitate to impose additional conditions.

MR. AMIR: Understood. Just that our respectful objection. Thank you, Judge.

THE COURT: Thank you.

So, Mr. Venti, all of the conditions set forth last week will remain in place. Do you understand all of those conditions, sir?

MR. VENTI: I do Your Honor, yes.

THE COURT: Do you want me to read them into the record? Again, I read the conditions for your co-defendant, Mr. Kuilan. They're the same conditions but I believe your

attorney has a copy of the bond.

MR. TURCO: I do, Your Honor. I have a copy in front of me.

THE COURT: So do you need me to read them into the record, sir?

MR. TURCO: You could read them into the record if you'd like, Your Honor, yes.

THE COURT: Very good. So it is $100,000 bond co-signed by the two suretors identified. You must appear in Court as required, surrender as directed for service of any sentence.

You must not commit a federal, state, or local crime while on release. You must co-operate in the collection of DNA if it's authorized.

You must advise the Court in writing before making any change in residence or telephone number. You must not possess a firearm, destructive device, or other dangerous weapon.

You must not use or unlawfully possess a narcotic drug unless it's prescribed by a licensed medical doctor and marijuana's still prohibited under federal law.

You must submit to Pre-trial supervision and report to Pre-trial as directed. You're -- you're subject to random home contacts and verification of employment as deemed appropriate to monitor compliance with the conditions of

release. And you shall notify Pre-trial Services as soon as possible of any arrest.

Let me say that that means that Pre-trial can verify that you are employed where you say you're employed and that you're going to the particular jobs that you may be dispatched to.

And if you are not doing that, and you're going off to do other nefarious business, Pre-trial's job is to let the Court know and there would be a violation and that would be a reason why there would be either incarceration pending the trial in this matter or more serious conditions set. Do you understand?

MR. VENTI: I do, Your Honor. I just want to make clear I haven't returned to work yet because of a few health issues I've had.

THE COURT: That's fine.

MR. VENTI: I was in the hospital for 10 days. I hopefully plan on going back next week.

THE COURT: I hope you can, too, sir.

MR. VENTI: Me, too.

THE COURT: Just make sure that Pre-trial knows when you do return to work, so if they look for you at home and you're not home, they know where you are, okay?

MR. VENTI: Okay, Your Honor, yes.

THE COURT: And you surrendered your passport and

agreed not to obtain a passport or a --

MR. VENTI: I didn't have one, Your Honor.

THE COURT: You didn't have a passport?

MR. VENTI: No.

THE COURT: But you agreed not to obtain one or any other document to travel?

MR. VENTI: Yes, I did.

THE COURT: And you were told to stay in New York City and Long Island?

MR. VENTI: Correct.

THE COURT: Do you understand that?

MR. VENTI: Yes.

THE COURT: And that you have no contact with your co-conspirator except in the presence of counsel. Do you understand that?

MR. VENTI: Understood, Your Honor.

THE COURT: And can -- you are going to undergo testing, evaluation, and treatment for substance abuse as directed by Pre-trial Services? Do you understand that?

MR. VENTI: Yes, I do.

THE COURT: And you may also undergo evaluation and treatment for mental health problems as directed by Pre-trial Services.

MR. VENTI: Correct, understood.

THE COURT: And that you should maintain verifiable

employment, do you understand that?

MR. VENTI: I do.

THE COURT: And this was signed by your sister and your sister's fiance on March 27th, do you understand that?

MR. VENTI: Yes.

THE COURT: And so, it's going to remain in place, but I'm going to sign it again and you're going to sign it again. I think we need both Defendants to sign.

THE CLERK: (Indiscernible.)

THE COURT: Yes, thank you so much.

And this is ready for you, too. Thank you very much.

So, by signing this, you're both agreeing to come back to Court whenever you're directed to do so and to abide by the conditions. That's for Mr. Venti -- yes, thank you.

THE CLERK: Okay, Mr. Venti.

MR. VENTI: Thank you.

THE COURT: When is -- oh, I have --

THE CLERK: Thank you.

MR. VENTI: Oh, just one.

THE CLERK: Yeah, thanks.

THE COURT: Okay, so now Mr. Kuilan and Mr. Venti, you've both been advised of the conditions under which you'll remain at liberty pending your trial and these charges. And we'll put you on at 2 o'clock tomorrow, Mr. Kuilan, for you to come back with the four suretors. They're not in the courtroom

today; is that correct?

MR. KUILAN: Two of them are.

MS. TANG: They're not all four here today, Your Honor.

THE COURT: There are two here?

MS. TANG: Yes, Your Honor.

THE COURT: So we could take the two that are here's signature so you don't have to get them to come back.

MS. TANG: Okay, Your Honor.

THE COURT: I did not know that was the case. So who are the two that are here, Ms. Tang?

MS. TANG: This is --

THE COURT: Please raise your hand and come up to this podium if you're going to assign this bond. Thank you.

Sorry, Sui May, but we might as well get two of them done since they're here.

THE CLERK: Yeah, yeah, absolutely. I (indiscernible).

THE COURT: We didn't know. Yes.

THE CLERK: Okay, so we have the proposed suretor who previously signed the bond. Two of them are here. Can you just state your name for the record, ma'am?

MS. PABELLON: My name is Elizabeth Pabellon.

THE CLERK: Okay Elizabeth Pabellon, I have you on here, 323.

THE COURT: You're the mom?

MS. PABELLON: I'm the mom.

THE CLERK: Okay. And ma'am?

MS. RIVERA: Denise Rivera.

THE COURT: And you're the girlfriend?

MS. RIVERA: Yes.

THE CLERK: Okay, so they're on the top two, Judge.

THE COURT: Yes.

THE CLERK: Okay.

THE COURT: And we'll just get them to re-sign or to state on the record.

THE CLERK: Yes.

THE COURT: And put the new date.

THE CLERK: That's correct.

THE COURT: So will you have them swear to the truth?

THE CLERK: Oh, yeah, right. Judge Bloom's going to ask you both some questions. So I just need to swear you to the answer, okay? Raise your right hand.

(Ms. Pabellon and Ms. Rivera are sworn)

THE CLERK: Thank you.

THE COURT: And Ms. Pabellon and Ms. Rivera, I'm sorry for the circumstances that bring you to the courthouse today.

As you've been made aware, your son, your boyfriend, has been indicted on these charges. And because the Government

has argued that he should be held pending the trial, I have reconsidered the bail bond that you signed last week for Mr. Kuilan and I have found that the Government has made some sense to me, but that I will not hold him pending the outcome of the trial as long as the four people who signed last week will agree to re-sign this week where I'm raising the amount in controversy, the amount that the condition of the release on bond is going to be a $250,000 bond.

And I am going to ask for Mr. Kuilan's grandmother, Ms. Garcia, who I imagine is your mom, Ms. Pabellon?

MS. PABELLON: That's my mother, uh-huh.

THE COURT: To put her paperwork. It means that if, God forbid, he gets scared and tries to run, the Government will have the papers for her home, which counsel has said is estimated to have a value of 1 point-something million. So that would be the first avenue that the Government would go for.

MS. PABELLON: I understand.

THE COURT: And again, the Government is not happy that I'm setting that as the condition rather than putting him in detention, but I find that that would be the reasonable way to go here, which would assure that he would come back to Court and not be a danger to the community.

MS. PABELLON: Definitely.

THE COURT: So can you just confirm for me, Ms.

Pabellon, you are his mom?

MS. PABELLON: The what?

THE COURT: You are his mom?

MS. PABELLON: I'm his mother, yes.

THE COURT: And that you signed this bond on the 19th for --

MS. PABELLON: I did.

THE COURT: -- $100,000 and that you're well aware of what this case is about?

MS. PABELLON: I -- yes, I am.

THE COURT: And that you also live in the same building that he lives in?

MS. PABELLON: I do.

THE COURT: Because you heard that the Government was not sure that the four people signing would have enough moral suasion, meaning that he might still do you wrong and try to run away. So you understand that that was something the Government raised?

MS. PABELLON: Yeah, I understand.

THE COURT: And you've retired?

MS. PABELLON: Yes, I am. I just recently retired.

THE COURT: Congratulations.

MS. PABELLON: Thank you.

THE COURT: And what did you do before you retired?

MS. PABELLON: I was an office manager bookkeeper.

THE COURT: And how long did you have that job?

MS. PABELLON: Almost 27 years.

THE COURT: And I'm sure you worked hard for every penny you earned?

MS. PABELLON: I did.

THE COURT: And you understand that the Government could go after your bank account, they could go after your 401(K), they could make it impossible for you to get credit, a mortgage. If you own part of your apartment, they could go after that if he doesn't live up to his obligations?

MS. PABELLON: I'm aware of that.

THE COURT: And I'm sorry, Ms. Rivera, I see that you're emotional at this moment. What do you do for a living?

MS. RIVERA: I'm a paralegal assistant.

THE COURT: And what kind of practice?

MS. RIVERA: Workers compensation.

THE COURT: And how long have you been with Mr. Kuilan?

MS. RIVERA: Like five years.

THE COURT: And so, you understand the seriousness of signing on to a bond like this?

MS. RIVERA: Yes.

THE COURT: And you understand if for any reason he doesn't live up to his obligations, that the Government can go after you in any combination, in any order to get the full

amount of the bond?

MS. RIVERA: Yes, I'm aware.

THE COURT: And you understand that they have now indicted him on these charges, which have a more serious sentence?

MS. RIVERA: Yes.

THE COURT: And Ms. Rivera, do you want to sign on to this bond?

MS. RIVERA: Yes.

THE COURT: And Ms. Pabellon, do you want to sign on to this bond?

MS. PABELLON: I do.

THE COURT: And so, I'm going to have my deputy bring it over for you to initial next to where you previously signed and put a new date.

MS. PABELLON: Okay.

THE COURT: Because all the other conditions that you heard me read into the record remain the same. It's just the amount.

MS. PABELLON: No problem.

THE CLERK: Just sign. Just sign, yeah, yeah. Thank you very much. Just date it next to your April 1st. Thank you.

MS. PABELLON: Right next to this?

THE CLERK: Yes, please.

MS. PABELLON: Uh-huh.

THE CLERK: Thank you.

And Ms. Rivera, just sign over here.

THE COURT: And Ms. Pabellon, if you could just help explain to your mother what's going on, because we're going to need her and your friend Ms. Rivera, who also signed the bond, to come on the phone tomorrow. They need not come into Court, but I'm glad that you are here today so that we could take care of this today. We don't need to be on the phone tomorrow at 2 o'clock.

MS. PABELLON: Okay.

THE COURT: You don't need to come back at 2.

MS. PABELLON: Okay.

THE COURT: Thank you, I've accepted --

MS. PABELLON: Thank you so much.

THE COURT: -- both of your signatures.

MS. PABELLON: Thank you.

MS. RIVERA: That means I have to bring his grandma tomorrow?

THE COURT: You don't have to bring her. She can come on the phone. We could give her a dial-in number.

MS. RIVERA: Okay.

THE COURT: And she could appear by phone. Does she speak English?

MS. RIVERA: She does, but she also has the machine.

THE CLERK: She has a (indiscernible).

MS. RIVERA: Yeah, so I don't understand.

THE COURT: Will you be able to hear here when she's --

MS. RIVERA: Yes, you will be.

MS. PABELLON: Okay.

THE COURT: As long as we could hear her on the record, that'll be fine. So we don't need a Spanish interpreter for her?

MS. RIVERA: No, you don't.

THE COURT: And we don't need a Spanish interpreter for your friend Rebecca Mejia?

MS. RIVERA: No.

THE COURT: And both of them should be prepared and your attorney should prepare you for this, to come on at 2 o'clock. And somebody needs to explain to the grandmother about the paperwork for the house, okay?

MS. RIVERA: Yes.

THE COURT: Thank you.

MS. RIVERA: Thank you.

THE COURT: Mr. Kuilan, I will just say you're very lucky that you have these four women who are willing to stand up for you under these circumstances. I know you may not feel lucky today.

Okay, I've been presented with an application and

order excluding the time between today and April 22nd, 2024 from the computation of the time period within which a trial on the charges against Mr. Kuilan and Mr. Venti must commence.

So I'm going to ask Mr. Amir to put on the record the basis for the application. And then, I'm going to question Mr. Venti and Mr. Kuilan and their attorneys regarding the application.

MR. AMIR: Your Honor, the exclusion of delay between today and April 22nd, 2024 is appropriate and in the interest of justice because it'll allow the parties to exchange discovery and begin plea negotiations as appropriate.

THE COURT: And the 4/22 date, I'm sorry, did you say it and I just missed it?

MR. AMIR: Yes, it's -- it -- the conference is April 22nd for Mr. Venti at 4:30 p.m. and for Mr. Kuilan at 5:00 p.m. before Judge Cogan.

THE COURT: So both of you will have to come back to Court to appear before the Honorable Brian Cogan on that date and time. Do not be late. Do not have a train delay or a traffic, nothing. Yes.

MR. KUILAN: Can you repeat that date?

THE COURT: Can you repeat the date and time?

MR. AMIR: Yes, April 22nd for Mr. Kuilan at 5:00 and for Mr. Venti at 4:30 p.m.

THE COURT: So, again, Mr. Kuilan and Mr. Venti, I've

been presented with applications and orders excluding the time between today and April 22nd. And although I'm confident that you discussed this matter with your attorneys, I need to make sure for myself that you understand the nature of the request and the consequences.

So permit me to start with you, Mr. Kuilan. Mr. Kuilan, the Government has 70 days from the date that you're arraigned on the indictment, which is what happened when we entered your not guilty plea to the indictment at the beginning of this proceeding.

The Government has to commence the trial against you within 70 days or else your attorney can come into Court and ask that the charges against you be dismissed as a violation of your right to a speedy trial.

This application stops that 70-day speedy trial time clock today and will not start that speedy trial time clock to run until April 22nd, 2024, when you appear before the Honorable Brian M. Cogan. Do you understand this application and its consequences?

MR. KUILAN: Yes, I do.

THE COURT: And have you discussed this matter with your attorney?

MR. KUILAN: Yes, I did.

THE COURT: Just bring the --

MR. KUILAN: Yes.

THE COURT: And do you have any questions for the Court regarding the application and its consequences?

MR. KUILAN: No.

THE COURT: And Ms. Tang, have you discussed this application and the consequences of signing the application with Mr. Kuilan?

MS. TANG: Yes, Your Honor.

THE COURT: And do you believe he understands it?

MS. TANG: Yes, Your Honor.

THE COURT: And is it both your signature and Mr. Kuilan's signature on this form application?

MS. TANG: That is correct.

THE COURT: And Mr. Kuilan, is this your signature?

MR. KUILAN: Yes.

THE COURT: Okay, thank you.

Now, to you, Mr. Venti. Mr. Venti, you've heard that the Government has 70 days from the date that you were arraigned on the indictment, which happened at the beginning of this proceeding when you entered your not guilty plea to commence the trial on this matter against you. And if they do not commence the trial within 70 days, you and your attorney can come into Court and ask that the charges against you be dismissed as a violation of your right to a speedy trial.

Do you understand that?

MR. VENTI: Yes, Your Honor, I do.

THE COURT: And that this application stops that 70 day speedy trial time clock today and does not start that clock to run again until your next appearance before the Court on April 22nd, 2024, do you understand that?

MR. VENTI: I understand, Your Honor.

THE COURT: Have you discussed this matter with your attorney?

MR. VENTI: I have.

THE COURT: Do you have any questions for the Court regarding the application?

MR. VENTI: No, Your Honor.

THE COURT: Do you have any questions for the Court regarding the consequences of signing this application?

MR. VENTI: No, Your Honor.

THE COURT: Then because the parties have proffered in both Mr. Kuilan and Mr. Venti's case, that they want this time to engage in plea negotiations and to exchange information regarding this matter and that they require this exclusion to focus their efforts on both plea negotiations and discovery without risking that despite their efforts, they wouldn't have reasonable time to effectively prepare the case, the Court grants this exclusion of time between today and April 22nd.

And I find that this exclusion of time serves the ends of justice and outweighs the interests of the public and the Defendant Michael Kuilan and the Defendant Antonio Venti

for the reasons stated on the record.

Was there any other matter, Mr. Amir, that needed to be addressed on behalf of the Government with respect to either Mr. Kuilan or Mr. Venti?

MR. AMIR: No, Judge, thank you.

THE COURT: And you'll put on the calendar whether it's you or some other assistant that at 2 o'clock will get the other two suretors to sign for Mr. Kuilan?

MR. AMIR: That's correct.

THE COURT: Very good. Anything further today on behalf of Mr. Kuilan, Ms. Tang?

MS. TANG: No, Your Honor.

THE COURT: I'll just remind you to file your notice of appearance as soon as you get back to your office.

MS. TANG: Understood.

THE COURT: Anything further on behalf of Mr. Venti?

MR. TURCO: No, Your Honor, thank you.

THE COURT: Then this matter is adjourned. Thank you very much.

(Proceedings concluded at 3:53 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Chris Hwang*

____________________ October 30, 2025

Chris Hwang Date

Court Reporter